685 A.2d 1329

JAMES B. JACKSON, PLAINTIFF–APPELLANT, v. GEORGIA–PA-
CIFIC CORP., JOSEPH E. SAVAGE, DEFENDANTS–RESPON-
DENTS, AND ROBERT GASTON, MARTIN BLUM, DEFEN-
DANTS.

Superior Court of New Jersey
Appellate Division

Argued November 14, 1996—Decided December 12, 1996.

1

4

Before Judges KING, CONLEY and LOFTUS.

*Frederic J. Gross* argued the cause for appellant (*Mr. Gross,* on the brief).

*Lisa H. Cassilly (Alston & Bird)* of the Georgia bar, admitted *pro hac vice,* argued the cause for respondent, Georgia–Pacific Corp. (*Murphy and O'Connor,* attorneys; *Ms. Cassilly* and *Robert H. Bucker,* on the brief).

The opinion of the court was delivered by

CONLEY, J.A.D.

In December 1989, plaintiff was fired from his job as foreman by defendant Joseph Savage, the plant manager of the Georgia–Pacific paper mill in Delair, New Jersey[1] in which plaintiff worked. In 1990, plaintiff filed a Law Division action which included allegations that his termination was racially motivated in violation of the Law Against Discrimination, *N.J.S.A.* 10:5–1 to 42(LAD), and that his termination was in violation of a company policy manual (a *Woolley*[2] common law wrongful discharge claim). In October 1993, summary judgment was granted defendants on the *Woolley* cause of action.[3] In January 1993, and pursuant to a mutual agreement that was expressly without prejudice as to all issues in the litigation, plaintiff was reemployed by Georgia–

---

[1] Georgia–Pacific owns and operates over one hundred plants nationwide and which produce a variety of materials.

[2] *Woolley v. Hoffmann–La Roche, Inc.,* 99 *N.J.* 284, 491 A.2d 1257, *modified,* 101 *N.J.* 10, 499 A.2d 515 (1985).

[3] Other causes of action were also pled and dismissed prior to trial. No issue as to them is before us and we, thus, need not more fully refer to them.

Pacific, but in an entirely different position and without supervisory responsibilities. Counsel then unsuccessfully sought "interim" counsel fees. Thereafter, following a nine-day jury trial, the jury concluded, in response to the first interrogatory on the verdict sheet, that plaintiff had not satisfied his initial burden under *McDonnell Douglas Corp. v. Green*, 411 *U.S.* 792, 802, 93 *S.Ct.* 1817, 1824, 36 *L.Ed.*2d 668, 677–78 (1973) (*McDonnell Douglas*), that is he had not proven by a preponderance of the evidence "that he was performing his job at a level which satisfied defendant's reasonable expectations."[4] The jury, therefore, did not proceed to the next two steps in the analysis, that is whether defendant "has articulated or advanced any legitimate nondiscriminatory business reason for its decision to terminate plaintiff" and, if yes, whether "plaintiff has proved that defendants' legitimate business reason was a pretext for discrimination." Pursuant to the "no cause" verdict, the complaint was dismissed.

We have, ourselves, read the entire transcript of the trial. While it is not, of course, our function to second-guess the jury, suffice it to say that we are not at all surprised by the verdict. The evidence in support of the jury's conclusion that plaintiff simply was not performing his job satisfactorily is, to put it mildly, overwhelming. To be sure, there is no evidence to suggest that the production that plaintiff was able to get from his crews was anything but satisfactory and, perhaps, even superior. Moreover, through his over fifteen years as a foreman, plaintiff continued to receive the positive evaluations that were needed for his annual pay raises. The evidence, however, from Savage, crew members (African–American and Caucasian alike), and the union representative revealed a supervisor whose sole concern was production to

---

[4] The other three prongs of the *McDonnell Douglas prima facie* burden (member of a protected group, termination, and replacement by a non-protected group) were not disputed. Whether, however, plaintiff was performing satisfactorily was hotly disputed, indeed the main issue. The jury's initial factual consideration, therefore, was focused upon that disputed issue.

the total disregard of the safety of his crew members and contrary to the expressed policies and expectations of management.

Between 1984–89 numerous grievances were filed against plaintiff reflecting his mistreatment of the employees and lack of safety concerns. Many of the grievances were filed in the last two years of plaintiff's employment and during a time when, the jury could have concluded, Georgia–Pacific's safety concerns for its employees had become increasingly important and of which plaintiff was fully aware. In response to this evidence, plaintiff simply considered his management style as "unorthodox" and asserted that none of the grievances had been substantial nor did he suffer any adverse consequences. He admitted, however, that he had been told that management believed he did not demonstrate sufficient concern for the safety of the employees and had been told that his use of abusive and profane language must stop and that he must demonstrate more concern for and tolerance of his employees. There was no evidence of any similar problem with the other foremen.

On December 9, 1989, an employee in plaintiff's crew, George Klapach, slipped on a ladder and fell. There was sufficient evidence for the jury to have concluded that plaintiff knew the employee was hurt but, despite the repeated counseling, ignored the accident for four hours between midnight and four in the morning, finally sending the injured employee to the hospital. Savage testified that although plaintiff did nothing to cause Klapach's injury, he ignored his back injury for a substantial period of time and this incident constituted the "last straw." The determination to fire plaintiff was made on December 11, 1989.

On appeal, plaintiff raises the following contentions:

POINT I. SUMMARY JUDGMENT SHOULD NOT HAVE BEEN GRANTED ON THE *WOOLLEY* CLAIM BECAUSE THE PURPORTED DISCLAIMER WAS MANIFESTLY INADEQUATE.

POINT II. A NEW TRIAL SHOULD BE GRANTED ON THE LAD CLAIM BECAUSE THE JURY WAS MISINSTRUCTED ON WHAT PLAINTIFF MUST PROVE.

POINT III. THE LOWER COURT'S EVIDENTIAL RULINGS IMPROPERLY PREVENTED PLAINTIFF FROM DEMONSTRATING THAT HIS TERMINATION WAS PART AND PARCEL OF A RACIST CORPORATE CULTURE AT GEORGIA–PACIFIC.

POINT IV. BY SIGNING THE JOINT FINAL PRETRIAL ORDER, DEFENDANTS CONSENTED TO THE MODIFICATIONS IN PLAINTIFF'S PLEADINGS AND THEY WERE NOT AT RISK OF SURPRISE ON THE NON–PROMOTION CLAIM.

POINT V. THIS LITIGATION WAS THE CATALYST FOR PLAINTIFF'S RETURN AFTER FOUR YEARS TO EMPLOYMENT WITH GEORGIA–PACIFIC, AND THEREFORE PLAINTIFF IS ENTITLED TO AN ATTORNEY FEE AWARD.

In considering these contentions, we have not only carefully read all of the briefs, but, as we have previously said, have independently read the entire transcript. We are convinced, preliminarily, that Judge Greene comprehensively and cogently considered all of the issues and objections raised and supported all of the trial rulings required by this trial with more than adequate findings and conclusions. And he did so in light of the applicable law, including the then very recently decided *Rendine v. Pantzer*, 276 *N.J.Super.* 398, 427–28, 648 *A.*2d 223 (App.Div.1994), *aff'd,* 141 *N.J.* 292, 661 *A.*2d 1202 (1995). We are utterly convinced that the trial judge's evidential rules complained of in point III are unassailable. We are also convinced that there is no basis for us to interfere with his discretionary ruling as to the proverbial "eve-of-trial" application to amend plaintiff's complaint to include a claim of discrimination arising from an alleged failure to promote that occurred some four years before plaintiff's termination. In so concluding, we acknowledge plaintiff's assertion that defendants were aware of this very separate cause of action by virtue of the inclusion of the claim in plaintiff's proposed listing of claims in the federal pretrial order.[5] But: 1) that pretrial order was never filed since the matter was returned to the trial court; 2) defendants did not acknowledge anywhere in their submissions in connection with

---

[5] Plaintiff's complaint alleged violation of unenumerated federal statutes. Defendant, without objection from plaintiff, removed the litigation to the federal district court. However, in January 1992, the matter was remanded by that court back to the state court.

that proposed order that that separate cause of action was, indeed, part of the litigation; and 3) plaintiff never, thereafter and upon return to the state court, sought to amend his pleadings. Accordingly, under these circumstances, we cannot fault the trial judge's exercise of discretion. We then address the contentions in points I, II and V. We do so in that order.

*a.*

Putting aside his reliance upon certain company manuals, plaintiff was an at-will employee, that is he could be fired with or without cause. *E.g. English v. College of Medicine & Dentistry,* 73 *N.J.* 20, 23, 372 *A.*2d 295 (1977). Although we have drawn some exceptions to that principle, *Pierce v. Ortho Pharmaceutical Corp.,* 84 *N.J.* 58, 417 *A.*2d 505 (1980), the discretion of a private employer to hire at-will remains viable. *Witkowski v. Thomas J. Lipton, Inc.,* 136 *N.J.* 385, 397–99, 643 *A.*2d 546 (1994). *See Bernard v. IMI Systems, Inc.,* 131 *N.J.* 91, 106, 618 *A.*2d 338 (1993) ("Today, both employers and employees commonly and reasonably expect employment to be at-will, *unless specifically stated in explicit, contractual terms."* (Emphasis added)).

Ordinarily, an express employment contract serves to create an other than at-will employment relationship. In *Woolley v. Hoffmann–La Roche, Inc., supra,* 99 *N.J.* 284, 491 *A.*2d 1257, the Supreme Court considered whether and under what circumstances a company employee manual will create certain employment protections even in the face of an otherwise at-will employment relationship. Under *Woolley,* if a discharged employee can demonstrate that a company manual was widely distributed and contained job security and disciplinary procedures that an employee reasonably could consider as establishing reciprocal rights and obligations, and the employee in reliance thereof continues employment, the company manual may be considered an implied contract of employment and the employee entitled to rely upon the protections contained therein. *Id.* at 309, 491 *A.*2d 1257. But the Court also observed that the mere distribution of a company

manual governing terms and conditions of employment does not, *ipso facto,* create such a contract.

■ There is no absolute test by which a company manual can be measured to determine if it has established an implied contract. *Witkowski v. Thomas J. Lipton, Inc., supra,* 136 *N.J.* at 392, 643 *A.*2d 546. The focus of the inquiry is the reasonable expectation of the employee, *ibid.* (citing *Woolley, supra* 99 *N.J.* at 297–98, 491 *A.*2d 1257), and encompasses consideration of "both the manual's specific provisions, and the context of its preparation and distributions." *Id.* at 392–93, 491 *A.*2d 1257 (citing *Woolley, supra,* 99 *N.J.* at 299, 491 *A.*2d 1257).

We have no quarrel here with the "context of the ... preparation and distribution" of the manuals at issue. *See Nicosia v. Wakefern Food Corp.,* 136 *N.J.* 401, 408, 643 *A.*2d 554 (1994) (even though manual was distributed to only 10% of the workforce and limited to supervisory personnel, the manual met the "widely distributed" factor). *Compare Kane v. Milikowsky,* 224 *N.J.Super.* 613, 541 *A.*2d 233 (App.Div.1988).

■ In addition to its distribution, however, the contents of the manual must be such as to create a reasonable expectation of job security. *See, for example, Radwan v. Beecham Labs.,* 850 *F.*2d 147, 149 (3d Cir.1988) (no implied contract created where termination policy that provided dismissal for cause included the language "may include, but is not limited to" examples listed); *Catalane v. Gilian Instrument Corp.,* 271 *N.J.Super.* 476, 494–95, 638 *A.*2d 1341 (App.Div.), *certif. denied,* 136 *N.J.* 298, 642 *A.*2d 1006 (1994) (manual which insured "open communication" through access to the company president, but which did not discuss termination or dismissal procedures, could not reasonably create an expectation of a contract). *Compare Schwartz v. Leasametric, Inc.,* 224 *N.J.Super.* 21, 31, 539 *A.*2d 744 (App.Div.1988) (employment manual with termination policy that provided non-exhaustive list of dischargeable offenses as well as a three-step progressive-discipline procedure was sufficient to establish an implied con-

tract). *Accord Witkowski, supra,* 136 *N.J.* at 396–97, 643 *A.*2d 546.

There are three company manuals here that surfaced during discovery and which were submitted to the summary judgment motion judge. They have been referred to as versions eight, nine, and ten. Version eight was issued in 1980 but expressly indicates that a new manual would be forthcoming. Version nine was issued in 1983 and was in effect in December 1989. Although defendant claimed that version ten should apply, its effective date appears to be January 1990 and plaintiff denies ever seeing it. We limit ourselves, then, to version nine.

Unlike version ten, version nine contains no progressive discipline provision.[6] Moreover, other than procedures concerning the termination pay and the removal of a terminated employee from the company premises, neither manual establishes any particular disciplinary procedures. As to terminations other than by resignation, plant closure, job elimination, retirement or death, version nine provides in pertinent part:

**Discharge for Cause**

A discharge for cause is a bad conduct discharge for proven reasons such as: theft, disclosure of trade secrets, dishonesty, insubordination, gross misconduct, neglect of duty, willful violation of company policy (e.g., alcoholic beverage and drug policies and policies designed to protect or properly document the transfer of company property), willful destruction of company property, or any other similarly serious reason.

---

[6] In this respect, version ten provided:

**Actions Which Normally Result in Warning Prior to Discharge.** Other discharges for cause may include, but are not limited to, continued violations which normally warrant progressive disciplinary steps— violations such as poor performance, neglect of duty, excessive absenteeism and tardiness, etc. Employees who are terminated by the company as a result of this type of violation will be paid through the last day worked and receive pay for untaken earned vacation but will not be eligible for severance pay as outlined below. They will not be paid any vacation accrued from January 1 of the current year unless required by state law.

The Law Department should be contacted prior to the discharge for cause of any employee. When it is imperative that the employee leave the company premises immediately, the employee should be suspended pending investigation.

Employees discharged for cause will not be given advance notice of termination. They will be paid only through the last day worked. They will not be paid any vacation accrued from January 1 of the current year.

⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅

**Involuntary Release**

Employees who are terminated by the company for any reason other than Discharge for Cause as described in Paragraph A. above (e.g., terminated as a result of unsatisfactory performance) will be given at least two weeks' notice or pay in lieu thereof, provided they have completed the local probationary period, if any. They will be paid through the last day worked and receive pay for earned and accrued vacation and will also receive termination pay as outlined in Paragraph D. below.

To the extent version nine creates any expectation of protected employment, it would be only that a discharge for cause would be for serious misconduct. To the extent any rights are created as to a "termination for cause" and an "involuntary termination" (which appears to include a release for unsatisfactory performance), they relate solely to the entitlement to two weeks notice or pay in lieu thereof and pay for accrued vacation time.

There is absolutely nothing in version nine that would lead an employee to reasonably believe that he or she could be terminated only for "bad conduct" or that he or she could not be terminated before the use of progressive discipline. *Compare Nicosia, supra,* 136 *N.J.* at 408, 643 *A.2d* 554 (employer was bound by manual since it was specific as to both disciplinary and termination procedures) *with Johnston v. Panhandle Co-op. Ass'n,* 225 *Neb.* 732, 741, 408 *N.W.2d* 261, 268 (1987) (cited with approval in *Witkowski, supra,* 136 *N.J.* at 397, 643 *A.2d* 546, and finding no implied contract because employment manual failed to provide any "disciplinary procedures short of termination").

Moreover, even assuming the manual here was sufficient to establish some reasonable expectation on the part of the employees that was violated by plaintiff's termination, *Woolley* made it clear that an employer need not be bound by such expectation if it

clearly states in the manual that that is not the intent of the manual:

> All that need be done is the inclusion in a very prominent position of an appropriate statement that there is no promise of any kind by the employer contained in the manual; that regardless of what the manual says or provides, the employer promises nothing and remains free to change the wages and all other working conditions without having to consult anyone and without anyone's agreement; and that the employer continues to have the absolute power to fire anyone with or without good cause.
>
> [99 *N.J.* at 309, 491 *A.*2d 1257].

*And see Nicosia,* 136 *N.J.* at 415, 643 *A.*2d 554. The disclaimer must, then, be both "clear" and "prominent" so that the employee "unmistakably" understands that the manual provisions will not bind the company. Although the Supreme Court in *Nicosia* noted that to make such a determination consideration should be made of the physical appearance of the disclaimer, such as its typeface, point size, heading, and the degree to which it is "separated from or set off in a way to attract attention," 136 *N.J.* at 415, 643 *A.*2d 554, we do not read anything in *Nicosia,* and certainly nothing in *Woolley,* that requires some particular bold type, set-off, or symbol to alert the employee. *See Nicosia, supra,* 136 *N.J.* at 416, 643 *A.*2d 554 ("the requirement of prominence can be satisfied in a variety of settings, and ... no single distinctive feature is essential *per se* to make a disclaimer conspicuous....").

Here, no such bold type, set-off or separate highlighting symbol appears in version nine. But, to us, just as effective is the placement of the disclaimer. It is the very first paragraph under the heading "Termination of Employment—Salaried Employees." That is precisely where employees such as plaintiff would look to determine their rights, if any. And the very first paragraph warns:

> It is the policy of Georgia–Pacific that the employment and compensation of any employee can be terminated, with or without cause, at any time, at the option of the employee or at the option of the company. No employee or representative of Georgia–Pacific, other than the Chief Executive Officer or the Corporate Director—Employee Relations and Administrative Services, has any authority to enter into any agreement extending the employment of any employee for any specified period of time, or to make any agreement contrary to the foregoing.

Not only is the disclaimer prominently located, but its language is clear. No reasonable employee could fail to understand that the manual was not intended to change the employer's right to terminate its employees with or without cause. And that is what is required for an effective disclaimer. *Compare Nicosia, supra,* 136 *N.J.* at 413–14, 643 *A.*2d 554 (attempted disclaimer that provisions of company manual "are not contractual and are subject to change and interpretation" did not make clear that the employer retained the absolute right to fire with or without cause); *Sellitto v. Litton Systems, Inc.,* 881 *F.Supp.* 932, 939 (D.N.J.1994) (disclaimer that "[n]othing set forth in these policies and procedures constitutes a contract for employment nor shall any part of them be construed or interpreted in any way to constitute a contract of employment" was "legalistic language" which did not state that an employee could be fired with or without cause).

*b.*

In a claim of discriminatory discharge under the LAD, the "starting point" is *McDonnell Douglas Corp. v. Green,* 411 *U.S.* 792, 802, 93 *S.Ct.* 1817, 1824, 36 *L.Ed.*2d 668, 677 (1973). As articulated in *Clowes v. Terminix Int'l, Inc.,* 109 *N.J.* 575, 595–96, 538 *A.*2d 794 (1988), the plaintiff's *prima facie* case is established as follows:

> the employee must prove "[1] that he was in the protected … group, [2] that he was performing his job at a level that met his employer's legitimate expectations, [3] that he nevertheless was fired, and [4] that [the employer] sought someone to perform the same work after he left." Once the prima facie case has been established, the *McDonnell Douglas* analysis is followed in all other respects.
> [*Clowes, supra,* 109 *N.J.* at 597, 538 *A.*2d 794 (citations omitted).]

*See Erickson v. Marsh & McLennan Co., Inc.,* 117 *N.J.* 539, 553, 569 *A.*2d 793 (1990).

Consistent with *McDonnell Douglas,* and as initially requested by plaintiff, the trial judge instructed the jury:

> The plaintiff in this case has charged that the defendant Savage has unlawfully discriminated against him on his employment because of his race. To succeed in his claim, Plaintiff must first establish by a preponderance of the evidence an initial case of discrimination on account of his race.

To establish an initial case in support of his claim, the Plaintiff must show by a preponderance of the evidence that—and what he must show constitute four different elements. He must show, one, that he is a member of a protected class; two, that he was performing his job at a level which satisfied the employer's reasonable expectations; three, he must show that despite his performance, he was discharged; and four, that he was replaced by a non-protected worker.

Relative to those four elements in the plaintiff's initial case, I charge you as follows: Namely, I instruct you that there is no factual question for you to determine relative to three of them. First, the plaintiff is black. He's a member of a protected class. That is not a fact in dispute. Therefore, you don't have to determine that element. I charge you that it is a fact. That he was terminated by defendant. That again is not a fact in dispute. And it is also not disputed that he was replaced by a non-protected worker.

Therefore, of the four elements of plaintiff's initial case, I charge you that the plaintiff's initial burden of proof to prove by a preponderance of the evidence, is that he was performing his job at a level which satisfied the employer's reasonable expectations. This, of course, is in dispute between the parties.

If in the initial case of the plaintiff you do not find as a fact that the plaintiff has proven this particular element in support of his claim, then you would mark your verdict sheet question number one accordingly, cease your deliberations and return with your verdict sheet.

The jury was then instructed that if it concluded plaintiff had proven that his job performance met defendant's reasonable expectations, they were then to determine whether defendant had produced legitimate non-discriminatory reasons for his termination and, if so, whether that reason was a pretext, that is whether "defendant's reason ... is not worthy of belief, or that more likely than not it is not a true reason ... of it is not the only true reason ... that plaintiff's race was a determinative factor...." This was precisely what was required under *McDonnell Douglas*.

The jury answered the first inquiry in the negative and, thus, ended its deliberations. Plaintiff contends that it was error to permit the jury to consider whether he had established this prong of the *McDonnell Douglas prima facie* case. But plainly that issue was hotly contested, indeed, it was the very premise for his firing. *See Erickson v. Marsh & McLennan Co., Inc., supra,* 117 *N.J.* at 553, 569 *A.*2d 793 ("'Complainant would be required to show that he was 'qualified' in [the] sense that he was doing his job well enough to rule out the possibility that he was fired for

inadequate job performance, absolute or relative.' " (quoting *Loeb v. Textron, Inc.,* 600 *F.*2d 1003, 1013 (1st Cir.1979))).

Plaintiff argues, however, that this was a mixed-motive case in which the initial burden is shifted to the defendant and that the jury should have been so charged. *See Price Waterhouse v. Hopkins,* 490 *U.S.* 228, 244–45, 109 *S.Ct.* 1775, 1787–88, 104 *L.Ed.2d* 268, 285 (1989) (plaintiff's *prima facie* burden in a mixed-motive case is to show that discrimination "played a motivating part in an employment decision" and "the defendant may avoid a finding of liability only by proving that it would have made the same decision" if the discriminatory consideration had played no part).

The difference between a *McDonnell Douglas* or "pretext" case and a *Price Waterhouse* or "mixed-motive" case has been explained in the following manner:

> An employment discrimination case may be advanced on either a pretext or "mixed-motives" theory. In a pretext case, once the employee has made a prima facie showing of discrimination, the burden of going forward shifts to the employer who must articulate a legitimate, nondiscriminatory reason for the adverse employment decision. If the employer does produce evidence showing a legitimate, nondiscriminatory reason for the discharge, the burden of production shifts back to the employee who must show that the employer's proffered explanation is incredible. At all times the burden of proof or risk of non-persuasion, including the burden of proving "but for" causation or causation in fact, remains on the employee. In a "mixed motives" or *Price Waterhouse* case, the employee must produce direct evidence of discrimination, i.e., more direct evidence than is required for the *McDonnell Douglas/Burdine* [*Texas Department of Community Affairs v. Burdine,* 450 *U.S.* 248, 101 *S.Ct.* 1089, 67 *L. Ed.2d* 207 (1981)] prima facie case. If the employee does produce direct evidence of discriminatory animus, the employer must then produce evidence sufficient to show that it would have made the same decision if illegal bias had played no role in the employment decision. In short, direct proof of discriminatory animus leaves the employer only an affirmative defense on the question of "but for" cause or cause in fact.
>
> [*Starceski v. Westinghouse Electric Corp.,* 54 *F.*3d 1089, 1096 n. 4 (3d Cir.1995) (citations omitted).]

The distinction between a pretext and a mixed-motive case lies in the directness of proof of discrimination required by the plaintiff. *Starceski, supra,* 54 *F.*3d at 1097. In a mixed-motive case, "direct evidence of discriminatory animus leads not

only to a ready logical inference of bias, but also to a rational presumption that the person expressing bias acted on it." *Ibid.* *Accord Armbruster v. Unisys Corp.,* 32 *F.*3d 768, 778 (3d Cir. 1994):

[I]n the *Price Waterhouse* framework in a case unaffected by the Civil Rights Act of 1991, the evidence the plaintiff produces is so revealing of discriminatory animus that it is not necessary to rely on any presumption from the *prima facie* case to shift the burden of production. Both the burden of production and the risk of non-persuasion are shifted to the defendant who, because of the inference the overt evidence showing the employee's [sic] bias permits, must persuade the factfinder that even if discrimination was a motivating factor in the adverse employment decision, it would have made the same employment decision regardless of its discriminatory animus.

"At a bare minimum, a plaintiff seeking to advance a mixed-motive case will have to adduce circumstantial evidence 'of conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude.' " *Griffiths v. CIGNA Corp.,* 988 *F.*2d 457, 470 (3d Cir.), *cert. denied,* 510 *U.S.* 865, 114 *S.Ct.* 186, 126 *L. Ed.*2d 145 (1993), *overruled on other grounds, Miller v. CIGNA Corp.,* 47 *F.*3d 586 (3d Cir.1995) *(in banc)* (citation omitted). As observed by one circuit court:

[P]urely statistical evidence would not warrant [a mixed-motive] charge; nor would evidence merely of the plaintiff's qualification for and the availability of a given position; nor would "stray" remarks in the workplace by persons who are not involved in the pertinent decisionmaking process. Those categories of evidence, though they may suffice to present a prima facie case under the framework set forth in [*McDonnell Douglas*] and [*Burdine*], and may indeed persuade the factfinder that the plaintiff has carried his or her ultimate burden of persuasion, would not suffice, even if credited, to warrant a *Price Waterhouse* charge.

[*Ostrowski v. Atlantic Mutual Ins. Co.,* 968 *F.*2d 171, 182 (2d Cir.1992) (citations omitted).]

Unless there is evidence which can be fairly said to directly reflect unlawful bias, the case should be treated as a pretext case. *Hook v. Ernst & Young,* 28 *F.*3d 366, 374 (3d Cir.1994). In *Starceski, supra,* 54 *F.*3d at 1096, the court upheld the giving of a mixed-motive instruction since the plaintiff's manager testified that the manager over him gave orders to " 'doctor' Starceski's performance appraisals so that they would reflect poor

performance," in order to "set up older employees for termination in the impending work force reduction." *And see Stacks v. Southwestern Bell Yellow Pages, Inc.,* 27 *F.*3d 1316, 1323–25 (8th Cir.1994).

The trial court, then, must determine, as a matter of law, whether the case is a pretext or mixed-motive case: " 'an employee may present his [sic] case under both theories and the . . . court must then decide whether one or both theories properly apply at some point in the proceedings prior to instructing the jury.' " *Starceski, supra,* 54 *F.*3d at 1098 (quoting *Armbruster, supra,* 32 *F.*3d at 782 n. 17).

Here, plaintiff argued at the end of the case that the court should give a mixed-motive *Price Waterhouse* charge and shift the burden of proof of an affirmative defense to defendant. In rejecting this, the trial judge said:

> In the *Price Waterhouse* case, which involves the shifting of the burden of proof under certain circumstances to the defendant that occurs in a mixed-motive case, the evidence in that case relative to the discriminatory animus of the partners and other accountants . . . was all direct evidence out of the mouths of these reviewing people, that could lead one to infer, if they wished from what was out of their mouths, that the persons had certain discriminatory animus . . . because [plaintiff] was a female. . . .
>
> I don't find that kind of evidence in this case. . . . [T]he quality or the nature of this circumstantial evidence, to get the matter over into a mixed-motive posture, has to be of a certain nature. And that nature is directly connected with the decision maker in this case, which was Savage.

██ We are entirely in agreement. Simply put, there was no evidence here direct or indirect that an improper racial animus played a part in plaintiff's firing sufficient to shift the burden to defendant to explain that even so, it would still justifiably have fired plaintiff. The only evidence of Savage's reasons for firing plaintiff was his testimony that he made the decision only after the Klapach incident because it was the "last straw" in a series of incidents that had occurred over an extended period of time and after repeated warnings from management and which reflected improper treatment of employees and their safety. Several of the affected employees provided ample evidence of such lack of con-

cern and disregard. Plaintiff admitted that he had been warned with respect to his abusive treatment of his crew and to be more aware of safety, and that Savage told him he was being fired for failing to do so. There is no direct or indirect evidence that Savage had or was influenced by racial animus.

Plaintiff also asserts that he satisfied his *prima facie* burden by proof of "disparate treatment" and that the jury should have been so charged. This contention is premised upon a situation some ten years before his termination when another foreman, a Caucasian whose crew had been performing at a low production level, was not terminated. To remedy that situation, his crew was switched to plaintiff and plaintiff's crew was assigned to him.

Disparate treatment is one means of proving a pretext case. *E.g. E.E.O.C. v. Charles Schaefer Sons, Inc.,* 703 *F.Supp.* 1138, 1146 (D.N.J.1988). The court in *Schaefer* found that the plaintiff had established a *prima facie* case for a Title VII claim alleging discriminatory application of disciplinary sanctions to him as compared to other foremen or supervisors by showing:

(1) That plaintiff was a member of a protected group;

(2) That there was a company policy or practice concerning the activity for which he or she was discharged;

(3) That the non-minority employees either were given the benefit of a lenient company practice or were not held to compliance with a strict company policy; and

(4) That the minority employee was disciplined either without application of a lenient policy, or in conformity with the strict one.

[*Id.* at 1147 (citing *Brown v. A.J. Gerrard Mfg. Co.,* 643 *F.*2d 273, 276 (5th Cir.1981)).]

In *Schaefer, ibid.,* the plaintiff had demonstrated that the African–American supervisor was fired without warning when, under similar circumstances, Caucasian supervisors were not even investigated. Similarly, in *Brown, supra,* 643 *F.*2d at 276, the African–American plaintiff was fired after his first unexcused absence, while "[u]ncontroverted evidence showed numerous instances in which white employees were given extensive warnings for precisely that...." *See Catalane, supra,* 271 *N.J.Super.* at 497, 638 *A.*2d 1341.

██ Here, at the very most, plaintiff showed that about ten years earlier another foreman's crew had been switched in order to avoid terminating him for the poor performance of his crew. However, the reasons given by defendant for plaintiff's termination were his disrespect for employees he supervised, threatening employees and disregarding safety rules which had resulted in employee injuries. . Defendant's witnesses acknowledged that plaintiff's crew consistently put out quality products, but also that plaintiff's treatment of employees was unacceptable in repeated instances.

Simply put, plaintiff did not prove that his situation and the other foreman's were sufficiently similar to support an inference of disparate treatment. At best, plaintiff showed a single instance in which defendant responded short of termination to a Caucasian foreman whose crew had been performing poorly. Moreover, there is no indication that the other foreman mistreated his workers. We find no error in the trial judge's refusal to include a charge on disparate treatment.

### c.

██ We adhere to the American Rule that the prevailing litigant is not usually entitled to collect a reasonable attorney fee from the loser. *Rendine, supra,* 141 *N.J.* at 322, 661 *A.*2d 1202. One exception to that general rule is found in the LAD at *N.J.S.A.* 10:5–27.1, which authorizes an award of a reasonable attorney fee to the prevailing party in an action brought under the LAD. In applying this statute, we generally follow the federal standard for awarding attorney fees to the prevailing party under federal civil rights law. *Szczepanski v. Newcomb Medical Ctr.,* 141 *N.J.* 346, 355, 661 *A.*2d 1232 (1995). In this respect, plaintiff claims that his complaint "was the catalyst" for his "reemployment" and that, therefore, he should be, partially at least, considered a prevailing party within the meaning of *N.J.S.A.* 10:5–27.1 and entitled to his fees up to the point of his reemployment. *E.g. Baumgartner v. Harrisburg Housing Auth.,* 21 *F.*3d 541, 544 (3d Cir.1994) ("a

plaintiff who can prove that the existence of the lawsuit accomplished the original objectives of the lawsuit without a formal judgment can be a 'prevailing party' " for attorney fee purposes.). *And see Singer v. State*, 95 *N.J.* 487, 494, 472 *A.*2d 138 (1984), *cert. denied*, 469 *U.S.* 832, 105 *S.Ct.* 121, 83 *L. Ed.*2d 64 (1984); *Bolyard v. Berman*, 274 *N.J.Super.* 565, 581, 644 *A.*2d 1122 (App.Div.), *certif. denied*, 138 *N.J.* 272, 649 *A.*2d 1291 (1994); *Frank's Chicken House v. Mayor and Council*, 208 *N.J.Super.* 542, 546, 506 *A.*2d 751 (App.Div.1986); *H.I.P. v. K. Hovnanian at Mahwah*, 291 *N.J.Super.* 144, 154–55, 676 *A.*2d 1166 (Law Div.1996); *Feriozzi Co., Inc. v. Atlantic City*, 268 *N.J.Super.* 310, 317, 633 *A.*2d 581 (Law Div.1993); *Robb v. Ridgewood Board of Educ.*, 269 *N.J.Super.* 394, 400, 635 *A.*2d 586 (Ch.Div.1993).

In order to succeed on the catalyst theory, plaintiff must be able to demonstrate that the litigation was a material factor in the actions by defendant that is claimed to warrant counsel fees, as where "the litigation terminates in [plaintiff's] favor via a consent decree, an out-of-court settlement, a voluntary cessation of the defendant's unlawful practices, or other mooting of the case where the plaintiff has vindicated his or her rights." *Hughes v. Lipscher*, 852 *F.Supp.* 293, 303–04, 304 n. 17 (D.N.J. 1994). A plaintiff " 'prevails' " when " 'actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff.' " *Bolyard v. Berman, supra*, 274 *N.J.Super.* at 581, 644 *A.*2d 1122 (quoting *Farrar v. Hobby*, 506 *U.S.* 103, 110, 113 *S.Ct.* 566, 573, 121 *L. Ed.*2d 494, 503 (1992)). *Compare Southeastern Fisheries Ass'n, Inc. v. Chiles*, 876 *F.Supp.* 270, 271–72 (S.D.Fla.1995), *with Kutas v. Regan*, 712 *F.Supp.* 445, 447–48 (S.D.N.Y.1989). *And see Nunez–Soto v. Alvarado*, 956 *F.*2d 1 (1st Cir.1992); *Wheeler v. Towanda Area Sch. Dist.*, 950 *F.*2d 128 (3d Cir.1991); *Clark v. Township of Falls*, 890 *F.*2d 625 (3d Cir.1989).

Here, there is nothing in the record that would suggest plaintiff's lawsuit was such a material factor. Indeed, he did

not seek reemployment in his complaint. *Cf. Farrar v. Hobby, supra,* 506 *U.S.* at 111–12, 113 *S.Ct.* at 573, 121 *L. Ed.*2d at 499 ("a civil rights plaintiff must obtain at least some relief on the merits of his claim. The plaintiff must obtain an enforceable judgment against the defendant from whom fees are sought or comparable relief through a consent decree or settlement ... [o]nly under these circumstances can civil rights litigation effect 'the material alteration of the legal relationship of the parties' and thereby transform the plaintiff into a prevailing party. In short, a plaintiff 'prevails' when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." (citations omitted)). Moreover, plaintiff was not rehired to his former position. He was offered an entirely new and different job and one without the supervisory responsibilities which led to his firing in 1989. Furthermore, the new employment was expressly without any compromise or impact upon the issues involved in the lawsuit and, thus, did not materially alter the legal relationship between plaintiff and defendant in favor of plaintiff. *See Szczepanski, supra,* 141 *N.J.* at 355, 661 *A.*2d 1232 (to be a "prevailing party" for the purposes of entitlement to civil rights counsel fees " 'the plaintiff must be able to point to a resolution of the dispute [that] changes the legal relationship between itself and the defendant' " (quoting *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.,* 489 *U.S.* 782, 792, 109 *S.Ct.* 1486, 1493, 103 *L.Ed.*2d 866, 877 (1989))).

Plaintiff's employment did not resolve the issue of lost wages and punitive damages that his complaint sought. *Compare Bolyard v. Berman, supra,* 274 *N.J.Super.* at 582, 644 *A.*2d 1122 (although ultimate relief of automatic entitlement to counsel in all parole revocation matters was not obtained by way of final judgment, assignment of counsel to the named parolee plaintiffs was obtained and the record supported trial court's finding that through plaintiffs' efforts the Parole Board had adopted a "remedial scheme" to protect their right to counsel); *Frank's Chicken House v. Mayor and Council,* 208 *N.J.Super.* 542, 546, 506 *A.*2d

751 (plaintiff was a prevailing party entitled to attorney fees where the challenged ordinance banning nude dancing was ruled unconstitutional, despite the outcome against plaintiff in companion litigation concerning zoning regulations); *Feriozzi Co., Inc. v. Atlantic City, supra,* 268 *N.J.Super.* at 314, 633 *A.*2d 581 (plaintiff was a prevailing party where the city was granted a request for a ninety-day adjournment which permitted it to amend its ordinance to meet each of the constitutional challenges raised in the complaint).

We, moreover, observe that our Supreme Court has characterized the "prevailing party" test as two-pronged. *Singer v. State, supra,* 95 *N.J.* at 495, 472 *A.*2d 138 ("The test first . . . calls for a factual causal nexus between plaintiff's litigation and the relief ultimately achieved. . . . Second . . . it must be shown that the relief ultimately secured by plaintiffs had a basis in law." (citing *Nadeau v. Helgemoe,* 581 *F.*2d 275 (1st Cir.1978))). *And see Coalition for Basic Human Needs v. King,* 691 *F.*2d 597, 599 (1st Cir.1982). Here, there can be no characterization of plaintiff's reemployment as required by law or reflective of the merits of his suit. It was, then, no more than a gratuitous act on the part of defendant. *See Singer v. State, supra,* 95 *N.J.* at 495, 472 *A.*2d 138. "Fundamentally, a prevailing party is one who achieves a substantial portion of the relief it sought." *H.I.P. v. K. Hovnanian at Mahwah VI, Inc., supra,* 291 *N.J.Super.* at 154, 676 *A.*2d 1166.

Finally, an award of counsel fees under LAD is not mandatory. Our review, then, is limited to determining whether the trial judge abused his discretion in denying the request. Under the circumstances here, we see no basis for interfering with that discretion.

Affirmed.