Reversed and remanded for further proceedings consistent with this opinion.

22 A.3d 11

SARA LAPIDOTH, PLAINTIFF–APPELLANT, v. TELCORDIA TECHNOLOGIES, INC., DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Submitted April 12, 2011—Decided June 9, 2011.

Before Judges PAYNE, BAXTER and KOBLITZ.

*Farrell & Thurman, P.C.* and *Chaim B. Book (Moskowitz & Book, L.L.P.)* of the New York bar, admitted pro hac vice, and *Jonathan S. Konovitch (Moskowitz & Book, L.L.P.)* of the New York bar, admitted pro hac vice, attorneys for appellant (*John L. Thurman,* of counsel and on the brief; *Mr. Book* and *Mr. Konovitch,* on the brief).

*McElroy, Deutsch, Mulvaney & Carpenter, L.L.P.,* attorneys for respondent (*Francis X. Dee,* of counsel and on the brief; *Colleen M. Duffy,* on the brief).

The opinion of the court was delivered by

KOBLITZ, J.S.C. (temporarily assigned).

Plaintiff Sara Lapidoth appeals the October 7, 2009 order denying her summary judgment motion and granting defendant Telcordia Technologies, Inc.'s (Telcordia) summary judgment motion in her action for breach of contract and interference with rights under the Family and Medical Leave Act (FMLA), 29 *U.S.C.A.* §§ 2612 to 2654, and the New Jersey Family Leave Act (NJFLA), *N.J.S.A.* 34:11B–1 to –16. Lapidoth's claims stem from her termination when she sought to return from a pre-approved year-long maternity leave. After reviewing the record in light of the contentions advanced on appeal, we reverse the grant of summary judgment to defendant on the contract claim and affirm the remainder of the trial court's order. We agree with the trial court that Lapidoth's leave was neither covered by the FMLA nor the NJFLA as it exceeded twelve weeks. We conclude, however, that a reasonable employee could interpret the two letters Telcordia sent Lapidoth authorizing her leave as a promise of reinstatement.

On June 16, 1986, plaintiff began full-time employment with defendant's predecessor company, Bell Communications Research (Bell). At her request, in 1991, plaintiff began working part-time.

In the beginning of 2005, plaintiff became a part-time release manager on a product called ARIS. Her duties included setting release schedules, "tracking milestones, running the release meetings, [and] making sure that the product was following all of the quality methods of operation procedures and paperwork ..." Defendant required her to work twenty-five hours per week, but she often worked overtime because of the volume of work.

On April 11, 2005, plaintiff requested a six-month maternity leave because she was expecting her tenth child. Throughout her employment, plaintiff had requested and had received leaves of absence for the births of her other nine children. Plaintiff's supervisor, Craig Joseph, notified plaintiff that Janice Cocca, a release manager on two other products, would perform plaintiff's job in her absence. Prior to plaintiff beginning her maternity leave, plaintiff trained Cocca to act as release manager for ARIS.

On June 1, 2005, plaintiff stopped working, and on June 9, 2005, she gave birth to her son.

On June 20, 2005, defendant sent plaintiff a form letter notifying her that defendant had approved her six-month leave of absence. The letter reiterated the company policy on maternity leave, stating, in relevant part:

[Y]our unpaid Family Care Leave of Absence from July 22, 2005 through January 22, 2006 is approved and will be counted towards your 12 weeks of 2005 and 2006 Family and Medical Leave Act (FMLA) entitlement.

. . . .

This leave is granted with a guarantee of reinstatement up to 12 months to the same or comparable job, including the number of hours and days worked during the week, salary, and benefits prior to the Leave starting. Reinstatement is not guaranteed if your job is declared surplus or the number of hours you request to work at the time of reinstatement is different than when the Leave commenced.

During the course of litigation, defendant defined "declared surplus" to mean "the position the employee was filling is no longer

required," and also referred to it as "a reduction in force or force adjustment."

On January 6, 2006, plaintiff requested another six-month leave to run from January 22 to July 21, 2006. That same day, defendant approved the request and again notified plaintiff in writing that so long as her position was not declared surplus and she did not request a change in hours, reinstatement of her position was guaranteed following her leave.

In February 2006, after defendant reorganized, Joseph lost supervision of one release manager and determined that the ARIS product required a full-time release manager. Cocca filled that position.

In June 2006, plaintiff informed defendant that she planned to return to work on July 20, 2006, in a part-time capacity working twenty-five hours per week. Joseph asked plaintiff if she was willing to return to work full-time because the ARIS release manager position required those additional hours, and plaintiff said she was willing to return full-time.

Due to budgetary constraints, defendant could only maintain one full-time ARIS release manager position. Joseph compared plaintiff's and Cocca's yearly performance evaluations and found that Cocca had somewhat better ratings. Based on those ratings, Joseph chose Cocca for the job. No other positions were available to offer plaintiff, so defendant terminated her employment, believing that it was free to do so because plaintiff was an at-will employee, and the FMLA and the NJFLA required reinstatement at the end of a leave only when the leave was twelve weeks or less.

Throughout plaintiff's employment, defendant's Code of Business Ethics (Code) contained the following at-will employment policy:

This Code of Business Ethics as well as each of the policies, practices, and procedures contained in it and every other Telcordia document, is not a contract of employment and does not create any contractual rights, either expressed or implied, between the company and its employees. The policies, practices, and procedures described in this Code may be changed, altered, modified, or deleted at

any time, with or without prior notice from information in this code when making decisions related to employment with Telcordia.

Telcordia employees are employees-at-will. This means that employees have the right to terminate employment at any time, with or without grounds, just cause or reason and without giving prior notice. Likewise, Telcordia has the right to terminate the employment of any of its employees at any time with or without grounds, just cause or reason and without giving prior notice.

Defendant posted the Code on defendant's website and annually distributed it to all employees. Also, when plaintiff applied originally for a position with Bell, plaintiff signed an employment application, acknowledging that "acceptance of an offer of employment does not create any contractual rights, either express or implied, between the company and me."

In February 2007, plaintiff filed a complaint alleging that defendant had (1) discriminated and retaliated against her in violation of the FMLA and the NJFLA by discharging her because she took maternity leave, and (2) breached a contract to reinstate her employment at the conclusion of her leave. The trial court found that defendant's Code provided a clear disclaimer that all employment was at-will, and plaintiff presented no evidence to alter that relationship or policy. The court found that defendant did not violate the FMLA or the NJFLA because those statutes required reinstatement of employment only when an employee takes a twelve-week-or-less leave of absence, and here, plaintiff took a one-year leave of absence.

I

Plaintiff argues on appeal that the court erred in making both findings and granting defendant's summary judgment application. We review a grant of summary judgment de novo, applying the same standard governing the trial court under *Rule* 4:46. *Liberty Surplus Ins. Corp. v. Nowell Amoroso, P.A.*, 189 *N.J.* 436, 445–46, 916 *A.*2d 440 (2007). Generally, we must "consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." *Brill v. Guardian Life Ins. Co. of*

*Am.,* 142 *N.J.* 520, 540, 666 *A.*2d 146 (1995); *see also R.* 4:46–2(c). Further, a trial court's legal interpretation of the meaning of a contract is subject to de novo appellate review. *Fastenberg v. Prudential Ins. Co. of Am.,* 309 *N.J.Super.* 415, 420, 707 *A.*2d 209 (App.Div.1998).

Plaintiff argues that the trial court erred in dismissing her claims under the FMLA and the NJFLA. We agree with the court that neither the FMLA nor the NJFLA applies to a one-year leave. Both the FMLA and the NJFLA entitle an employee to twelve weeks of leave for the birth of a child, 29 *U.S.C.A.* § 2612(a)(1)(A); *N.J.S.A.* 34:11B–4, and require that upon completion of the leave, the employee be returned to his or her previous position, or a comparable one. 29 *U.S.C.A.* § 2614(a)(1); *N.J.S.A.* 34:11B–7.

Plaintiff argued to the trial court, as she does on appeal, that defendant violated the FMLA and the NJFLA by not reinstating her position, or a comparable one, at the end of her twelve-month leave because defendant had told her that it would do so, in accordance with its maternity leave policy. She recognized that the FMLA and the NJFLA speak only of a twelve-week leave, but argued that the statutes' guaranteed-reinstatement provisions apply when a leave is longer than twelve weeks if the leave is authorized by the employer, pursuant to its company-wide policy, based on the holdings in *Santosuosso v. NovaCare Rehabilitation,* 462 *F.Supp.*2d 590 (D.N.J.2006) and *Gadinski v. Shamokin Area Community Hospital,* 116 *F.Supp.*2d 586, 589–90 (M.D.Pa.2000).

In *Santosuosso,* the court held that an employer may violate the FMLA and the NJFLA when the employer authorizes a maternity leave longer than twelve weeks and fails to reinstate the employee to his or her position, or a comparable one, upon completion of the leave. *Id.* at 597–98.

In *Gadinski,* the court considered the validity of 29 *C.F.R.* § 825.700(a), an FMLA Department of Labor regulation that prohibits an employer from counting a twelve-week leave toward

FMLA time when the employer failed to notify an employee that the leave would count toward the employee's FMLA leave time. *Gadinski, supra,* 116 *F.Supp.*2d at 589. The effect of the regulation was that when an employer failed to provide the mandated notice, the employee would receive an additional twelve weeks of FMLA leave. *Ibid.* The court found the regulation valid, though it recognized that other federal courts had held otherwise. *Id.* at 589–91.

The trial court in this case, relying on *Ragsdale v. Wolverine World Wide, Inc.,* 535 *U.S.* 81, 87, 122 *S.Ct.* 1155, 1160, 152 *L.Ed.*2d 167, 176 (2002), found that the FMLA and the NJFLA only guaranteed reinstatement when the employee took a twelve-week-or-less leave of absence. In *Ragsdale,* the Court held invalid the same regulation that the *Gadinski* court had found valid. The Court found that the penalty imposed by the regulation fundamentally changed the FMLA by granting an employee an additional twelve weeks of leave without any showing that the employee suffered any prejudice from the employer's lack of notice. *Ragsdale, supra,* 535 *U.S.* at 90, 122 *S.Ct.* at 1162, 152 *L.Ed.*2d at 177. The Court explained that a "fundamental substantive guarantee" of the FMLA, was an employee's entitlement to twelve weeks' leave in a twelve-month period. 535 *U.S.* at 93–94, 122 *S.Ct.* at 1163–64, 152 *L.Ed.*2d at 179. The Court noted the significance of the twelve-week figure, explaining that Congress resolved the conflicting interests of employers, who wanted less leave time, and employees, who wanted more, by choosing the twelve-week period, which was "long enough to serve 'the needs of families' but not so long that it would upset 'the legitimate interests of employers.'" *Ibid.* (quoting 29 *U.S.C.A.* § 2601(b)).

The Court held that the Department of Labor was not free to change the legislative compromise by granting employees an additional twelve weeks of leave when an employer fails to provide the employee notice that his or her leave will be subtracted from the yearly FMLA leave time. 535 *U.S.* at 94, 122 *S.Ct.* at 1164, 152 *L.Ed.*2d at 180.

The trial court in this case relied on *Ragsdale* to find that defendant did not violate the FMLA or the NJFLA. To the extent the *Santosuosso* and *Gadinski* decisions were inconsistent with the *Ragsdale* decision, the trial court found that they were overruled.[1]

On appeal, plaintiff again relies on the *Santosuosso* and *Gadinski* decisions in claiming that defendant violated the FMLA and the NJFLA when it failed to reinstate her employment. She argues that the facts in *Ragsdale* are distinguishable from those in her case because in *Ragsdale* the employee took a leave that was longer than the one the employer had authorized, and the employee was unable to establish damages or prejudice.

■ The court correctly found that defendant did not violate the FMLA by failing to reinstate plaintiff after her twelve-month leave because, as the *Ragsdale* decision provides, the FMLA guarantees reinstatement of employment for leaves of absence that last for twelve weeks or less. That rule applies to this case regardless of whether or not the *Ragsdale* facts are distinguishable. As the trial court found, to the extent the *Santosuosso* and *Gadinski* decisions hold otherwise, they have been overruled.

## II

Plaintiff contends also that the trial court erred in granting defendant's motion for summary judgment on her breach of contract claim. She argues, as she did below, that the two letters approving her leaves of absence and guaranteeing her job upon completion of her leave amounted to a contract, and defendant breached that contract by terminating her employment.

■ Absent a contract providing otherwise, employment in New Jersey is at-will. *Witkowski v. Thomas J. Lipton, Inc.*, 136

---

[1] The trial court also noted two other federal decisions that were consistent with *Ragsdale*. *See Holmes v. e.spire Commc'ns, Inc.*, 135 F.Supp.2d 657, 666 (D.Md.2001); *Palao v. Fel–Pro, Inc.*, 117 F.Supp.2d 764, 769 (N.D.Ill.2000).

*N.J.* 385, 397, 643 *A.*2d 546 (1994). Accordingly, the employer may terminate an at-will employee for any reason, except for the few exceptions proscribed by law. *Ibid.*

■ A contract for employment may arise from a company policy or practice, *Woolley v. Hoffmann–La Roche, Inc.,* 99 *N.J.* 284, 298, 491 *A.*2d 1257 (1985), or from a promise made by the employer directly to the employee. *Troy v. Rutgers,* 168 *N.J.* 354, 369, 774 *A.*2d 476 (2001).

In *Woolley, supra,* the plaintiff, Richard Woolley, was terminated after nine years of employment because his supervisor "had lost confidence in him." 99 *N.J.* at 286, 491 *A.*2d 1257. He filed suit, claiming that the "defendant's employment manual created a contract under which he could not be fired at will, but rather only for cause, and then only after the procedures outlined in the manual were followed." *Id.* at 286–87, 491 *A.*2d 1257. Woolley was not terminated for cause, and he was not provided any process in connection with his termination. *Id.* at 286–87, 491 *A.*2d 1257.

The defendant-employer filed a motion for summary judgment arguing that Woolley was an at-will employee and that it had never entered an agreement to the contrary. *Id.* at 287, 491 *A.*2d 1257. The trial court agreed and granted the defendant's motion, and we affirmed. *Ibid.* The Supreme Court reversed, finding that a question of fact existed as to whether the defendant's written employment policy created an offer to its employees. *Ibid.*

The Court explained: "In determining the manual's meaning and effect, we must consider the probable context in which it was disseminated and the environment surrounding its continued existence." *Id.* at 298, 491 *A.*2d 1257 (footnote omitted). The Court noted that the defendant was a "substantial company with many employees." *Ibid.* The Court found that although the manual was not distributed to all employees, it covered all employees, and because the "manual represent[ed] the most reliable statement of the terms of . . . employment . . . it would be almost inevitable for

an employee to regard it as a binding commitment, legally enforceable, concerning the terms and conditions of his employment." *Id.* at 298–99, 491 *A.*2d 1257.

The Court then found that where a manual "is prepared without any negotiations and is voluntarily distributed to the workforce by the employer . . . [i]t is reasonable to interpret it as . . . an offer that seeks the formation of a unilateral contract—the employees' bargained-for action needed to make the offer binding being their continued work when they have no obligation to continue." *Id.* at 302, 491 *A.*2d 1257.

The Court's holding did not preclude an employer from adopting a company policy that did not create contractual rights. *Id.* at 309, 491 *A.*2d 1257. The Court explained that to avoid an appearance of a promise in a manual,

[a]ll that need be done is the inclusion in a very prominent position of an appropriate statement that there is no promise of any kind by the employer contained in the manual; that regardless of what the manual says or provides, the employer promises nothing and remains free to change wages and all other working conditions without having to consult anyone and without anyone's agreement; and that the employer continues to have the absolute power to fire anyone with or without good cause.
[*Ibid.*]

Decisions following *Woolley* have focused on the reasonable expectations of the employee in determining whether an employment policy created contractual rights. *See Jackson v. Georgia–Pacific Corp.*, 296 *N.J.Super.* 1, 12, 685 *A.*2d 1329 (App.Div.1996) (explaining that the determination of the reasonable expectation of the employee encompasses the specific provisions of the manual as well as its preparation and distribution), *certif. denied,* 149 *N.J.* 141, 693 *A.*2d 110 (1997). A policy will weigh in favor of creating contractual rights when the policy is clear and detailed and is widely disseminated to the workforce. *Nicosia v. Wakefern Food Corp.*, 136 *N.J.* 401, 409, 643 *A.*2d 554 (1994).

■ Although a disclaimer may preclude the creation of contractual rights, the disclaimer may also be unenforceable. *Id.* at 411–12, 643 *A.*2d 554. The purpose of a disclaimer "is to provide

adequate notice to an employee that she or he is employed only at will and is subject to termination without cause." *Id.* at 412, 643 *A.*2d 554. However, as the *Woolley* Court recognized, "[i]t would be unfair to allow an employer to distribute a policy manual that makes the workforce believe that certain promises have been made and then to allow the employer to renege on those promises." *Woolley, supra,* 99 *N.J.* at 309, 491 *A.*2d 1257. Thus, if an employer intends to preclude the creation of contractual rights and to maintain a relationship where it may terminate the employee without cause, it must say so in plain language that an employee will understand. *Nicosia, supra,* 136 *N.J.* at 413, 643 *A.*2d 554. Legalese will not suffice. *Ibid.* Further, the disclaimer "must be in a very prominent position." *Woolley, supra,* 99 *N.J.* at 309, 491 *A.*2d 1257.

"[W]hen the facts surrounding the content and placement of a disclaimer are themselves clear and uncontroverted ... the effectiveness of a disclaimer can be resolved by the court as a question of law. Conspicuousness will always be a matter of law." *Id.* at 416, 643 *A.*2d 554. Similarly, when the facts clearly and uncontrovertibly establish the effect of a disclaimer's content, the court can resolve it as a matter of law. *Ibid.* However, in cases where the disclaimer's effect is unclear, a fact-finder must resolve the issue. *Ibid.*

In addition to an employment manual, a representation made by the employer directly to the employee may create a contractual right. *Troy, supra,* 168 *N.J.* at 369, 774 *A.*2d 476; *Shebar v. Sanyo Bus. Sys. Corp.,* 111 *N.J.* 276, 544 *A.*2d 377 (1988). In *Shebar,* the plaintiff worked for Sanyo Business Systems Corp. (Sanyo) for three years before accepting a job offer from a competing company, Sony. *Shebar, supra,* 111 *N.J.* at 284, 544 *A.*2d 377. The plaintiff conceded that during the three years that he worked for Sanyo he had been an at-will employee and that Sanyo had never disseminated a company policy altering the at-will relationship. *Ibid.* Shebar said that when he informed Sanyo of his accepting the offer from Sony, Sanyo orally promised

him that if he revoked his acceptance and continued his employment with Sanyo, he would have a job for life, or at least would not be terminated without cause. *Ibid.* Relying on that promise, Shebar revoked the acceptance he had given to Sony. *Ibid.* Four months later, Sanyo terminated him without cause. *Ibid.*

Shebar filed suit alleging breach of contract. *Ibid.* The trial court dismissed the claim on Sanyo's motion for summary judgment, finding no enforceable contract. *Ibid.* The Appellate Division affirmed, but the Supreme Court reversed. *Ibid.*

The Court ruled that to the extent Shebar's claim was based on a promise of employment for life, it failed for lack of proof. *Id.* at 287–88, 544 *A.*2d 377. The Court found that Shebar's claim that Sanyo had promised him employment so long as there was no cause for termination raised a question of fact sufficient to survive summary judgment. *Id.* at 288, 544 *A.*2d 377. The Court explained that if the plaintiff agreed to "relinquish his new position at Sony in exchange for job security at Sanyo[,][and] Sanyo, in turn, agreed to relinquish its right to terminate plaintiff's employment at will ... [s]uch bargained-for and exchanged promises furnish ample consideration for an enforceable contract." *Id.* at 289, 544 *A.*2d 377. The Court went on to explain that "a factfinder could conclude that plaintiff gave valuable consideration for Sanyo's promise of continued employment with termination only for cause." *Ibid.*

 Here, the trial court found that plaintiff had failed to establish a breach of contract claim because defendant's Code contained a clear disclaimer that employment was at-will and thus could be terminated by the employer or employee at any time. The court found that plaintiff's "sole basis" for the breach of contract claim were the two letters authorizing her leaves of absence, which did not alter the at-will relationship because they "were sent to her personally" and "were not policy letters or form letters applicable to all employees." Further, unlike the plaintiff in *Shebar*, the court found that plaintiff here gave up nothing in exchange for defendant's alleged promise to employ her at the

completion of her leave. Thus, the letters did not amount to a promise, personal to plaintiff.

On appeal, plaintiff argues that, like the oral promise in *Shebar*, the two letters authorizing plaintiff's leaves of absence created a contract between plaintiff and defendant. She argues that in return for her forgoing other employment and returning to Telcordia, defendant promised to reinstate her position so long as the position was not declared surplus and she did not request hours different from those she worked prior to her leave. The ARIS release manager position survived the February 2006 force reduction, and plaintiff agreed to work full-time in that position as requested by defendant.

Plaintiff argues that the disclaimer in the Code should be interpreted as precluding the creation of contractual rights through the Code only. She argues that reading the disclaimer as applying to any action defendant might take in any context would be too expansive and would preclude defendant from entering into any employment contracts. It makes little sense, plaintiff argues, to conclude that an employer would restrict itself in that way. She argues also that the acknowledgement of at-will employment in the employment application should be limited in time to when she accepted employment and should not be interpreted to allow the employer to disavow future contracts.

Defendant denies that the authorization letters created any contractual rights and argues that it appropriately terminated plaintiff's employment because, as a result of the force reduction, "the number of Release Managers reporting to" Joseph was reduced from two to one, and plaintiff was less qualified than Cocca for the job. It claims that the letters it sent plaintiff approving her leaves of absence informed her that upon completion of her leave, reinstatement was not guaranteed if the company underwent a reduction in force.

We conclude that the court erred in dismissing plaintiff's breach of contract claim because the evidence could support a finding that defendant had promised to reinstate plaintiff's position at the end

of her leave. While defendant's Code and employment application provided that employment was at-will and that nothing in the Code or any of defendant's other policies, practices, and procedures created any contractual rights, defendant's letters relating its policy on maternity leave seemed to contradict those general provisions.

As defendant admits, the two authorization letters contained defendant's company-wide policy on maternity leave. That policy provided that leave was "granted with the guarantee of reinstatement up to 12 months [following the beginning of the leave] to the same or a comparable job." Reinstatement was not guaranteed if "[the employee's] job is declared surplus or the number of hours [the employee] request[s] to work at the time of reinstatement is different than when the Leave commenced."

Whether viewed as a company policy creating contractual rights or a promise made to a particular employee, a reasonable employee could interpret the policy as promising reinstatement. Further, defendant gave plaintiff nine previous maternity leaves and reinstated her employment at the conclusion of all of them. After this history, a reasonable employee could reasonably interpret the policy as promising reinstatement.

The maternity leave policy's first exception to reinstatement did not apply to plaintiff because the ARIS release manager position was not declared surplus. Rather, it was upgraded to a full-time position. Defendant contends that the exception applies because an overall force reduction led to the elimination of one of the two release manager positions under Joseph. Defendant's policy, however, plainly said that reinstatement is not guaranteed if "your job is declared surplus," not any similar job within your department. Thus, the exception is inapplicable.

The increase in the hours required for the ARIS release manager position did not fall within the second exception to reinstatement. That exception provided that reinstatement was not guaranteed if "the number of hours you request to work at the time of reinstatement is different than when the Leave commenced."

Here, defendant requested plaintiff to work additional hours, and plaintiff agreed to work full-time.

Defendant contends that Cocca was given the ARIS release manager position because she was better qualified. Cocca's superior qualifications are not relevant to whether defendant had promised plaintiff reinstatement and then breached that promise.

Given that we find the trial court mistaken in dismissing plaintiff's breach of contract claim, we need not consider plaintiff's alternate theory that the equitable principle of promissory estoppel applies.

Affirmed in part, reversed in part, and remanded for further proceedings.